## AFFIDAVIT OF EUGENE M. DIFIORE

I, Special Agent Eugene M. DiFiore, being duly sworn, do hereby depose and state that:

1.   I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately thirteen years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport ("Logan Airport") in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police, and special agents from the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies. Since the LATF was established, kilograms of controlled substances and millions of dollars of drug proceeds have been seized. Numerous drug traffickers have been convicted and millions of dollars of assets have been successfully forfeited as suspected drug proceeds.

2.   Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts, from 1995 to 1999. I was also a police officer with the Amesbury Police Department in Amesbury, Massachusetts, beginning in 1999, until I accepted a position as a criminal investigator with the DEA in 2005.

3.   Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities and the laundering of drug proceeds. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

> $48,940 in United States currency seized from Edwin Barosy, on February 1, 2018, at Logan Airport (the "Currency").

5. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

6. This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

7. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

### The Seizure of the Currency

8. Based upon the collective experience of the Massachusetts State Troopers and Special Agents of the participating law enforcement agencies assigned to the LATF and the accumulated criminal intelligence of the participating law enforcement agencies, Boston is not a source area for such drugs as cocaine, heroin, methamphetamine, oxycodone and marijuana. Instead, traffickers need to import these drugs from other source areas from within and outside of the United States to Massachusetts. The LATF has seized and successfully forfeited hundreds of

2

thousands of dollars travelling through Logan Airport to destinations throughout the State of California, specifically Los Angeles, which is a source city for such drugs.

9. On January 31, 2018, Special Agent David O'Neill ("Special Agent O'Neill") received information from Jet Blue Airlines that Edwin Barosy purchased a one way reservation for travel on Jet Blue Airlines Flight #987 (Boston, MA to Los Angeles, CA). The Jet Blue flight was scheduled to depart from Logan Airport at 9:20 p.m. that evening. The reservation was purchased the night before travel (January 30th) at 11:05 p.m.

10. A criminal history check for Barosy revealed the following: Barosy had multiple arraignments in the Commonwealth of Massachusetts, which included, but were not limited to criminal charges for Possession to Distribute Class B Substance, Distribute/Dispense Class B Substance, Control Substance in a School (Zone), and Possession Distribute Class D.

11. In addition, I recalled previously identifying Barosy as a potential courier for an individual known to law enforcement as John/Jane Doe ("Doe").[1] Specifically, in April 2016, Barosy was identified through reservation information as related to Doe and Doe's criminal associates because an email address associated with Doe was linked to the reservation of airline tickets for Barosy. Doe was previously identified by the DEA as a suspected leader of a cocaine distribution organization.

12. Based upon the recent purchase of a Jet Blue Airlines reservation to Los Angeles, Barosy's criminal history, his association with Doe, and the intelligence gleaned from previous encounters at Logan Airport with members of the Doe drug trafficking organization; on January 31, 2018 at approximately 7:30 p.m. members of the LATF established surveillance at Logan

---

[1] Not his/her true name. John Doe's true identity is known to me.

Airport Terminal C in anticipation of Barosy's arrival for his departure to Los Angeles. That evening, however, just before passengers began to board Jet Blue Flight #987, members of the LATF learned that Barosy canceled his reservation and rebooked for the following morning, February 1, 2018 on Jet Blue Flight #287 to Los Angeles.

13. In my training and experience, I am familiar with the practices and behaviors exhibited by couriers of both large amounts of currency and/or illegal narcotics. I know that one such practice is to cancel anticipated travel at a moment's notice. I have learned that one reason for the sudden cancellations is due to the fact that the money utilized to purchase narcotics has not been collected in its entirety and/or packaged for transport. I have also learned that another reason may be that the narcotics were not ready for transportation, subsequently pushing the anticipated travel to a later time or date. In addition, I also have learned that at times, law enforcement has been detected by counter surveillance and multiple changes to travel plans is one way that individuals involved in trafficking money and narcotics attempt to insulate themselves from detection by law enforcement.

14. On February 1, 2018, at approximately 5:00 a.m. members of the LATF re-established surveillance in Terminal C in anticipation of Barosy's arrival. At approximately 6:00 a.m., only fifteen minutes before Barosy's scheduled boarding time on Jet Blue Flight # 287, Barosy checked one piece of luggage. Accordingly, Barosy had only fifteen minutes to navigate the Transportation Security Administration's checkpoint. Based on my training and experience, I know that money couriers and drug traffickers often arrive late and limit their time on airport property to attempt to avoid detection by law enforcement.

15. At approximately 6:10 a.m., I located Barosy's checked luggage in the Jet Blue bag room, notified members of the LATF, and responded to Barosy's departure gate for further investigation. At approximately 6:18 a.m., as passengers began to board Jet Blue Flight #287, I and other members of the LATF observed Barosy walking toward departure gate C8.

16. Barosy had a black and gray backpack. I approached Barosy and identified myself by displaying my credentials and DEA badge.

17. I advised Barosy that he was neither under arrest nor under any compulsion to speak with me. I asked if Barosy would consent to speaking with me regarding his travel and he agreed. Barosy identified himself and presented his passport. I asked Barosy if he had any difficulty with his airline reservation. Barosy advised that he missed his flight last night (January 31st) and had to rebook. I told Barosy that I was at the airport that evening and Barosy was never observed on airport property attempting to make that flight. Barosy did not reply to my assertion.

18. I asked Barosy why he was travelling and he said he was in the process of buying land in Los Angeles. I then asked Barosy where in Los Angeles he was buying property. Barosy answered "What?" I repeated my question and Barosy said he did not know where he was buying land, but that his business partner knew the address. I told Barosy that I found it difficult to believe an individual engaged in the purchase of property had no idea where he was going to invest his money and asked Barosy the name of his business partner. Barosy said, "Steve." I then asked, "Steve who?" Again, I was met with silence, followed by the response, "What?" Again, I asked "Steve who?" Barosy did not respond.

19. After additional conversation, during which Barosy was permitted to make a phone call, I advised Barosy that if he chose to further cooperate and discuss his travel, as well

as, the contents of his luggage, then we would ask that he sign a consent to search his property. However, Barosy was also advised that he was free to decline such consent, continue with his travel or accompany members of law enforcement to our barracks to wait while we obtained a search warrant to search his property.

20. After approximately ten minutes without a decision by Barosy, I told him I was going to seize his property pending further investigation and the execution of a search warrant. As agents/troopers attempted to remove the bag from his possession, Barosy attempted to physically prevent them from seizing his property. Barosy was told that further interference with the seizure would likely lead to criminal charges. Barosy regained his composure and asked for a receipt for the seized property. Barosy asked if he could retrieve his car keys from his backpack and gave Sgt. Steven Lopes verbal authorization and direction to remove the keys. As directed by Barosy, Sgt. Lopes unzipped the front pocket of the backpack, which exposed a large bundle of United States currency. Sgt. Lopes further located two sets of keys toward the bottom of the backpack's front pocket. The keys were given to Barosy and the backpack was closed. I asked Barosy how much money he had and whether there was any more located in either the backpack or his checked luggage. Barosy did not respond to my questions.

21. Ultimately Barosy decided to accompany us back to the Massachusetts State Police Troop F Barracks in order to obtain a receipt for his property. Barosy was again advised that he was not under arrest, was free to arrange his own ride to the barracks, or to continue with his travel. Barosy asked for a ride and was driven to the Troop F Barracks. Upon arrival, Barosy was escorted to the public lobby of the Troop F Barracks. Barosy was given a receipt for his backpack and checked luggage and left the lobby at approximately 7:09 a.m.

22. While I spoke with Barosy at the Logan Airport terminal, Trooper David Walsh contacted Trooper Brian Cooper of the State Police and requested that he and his narcotic trained K-9 review Barosy's checked luggage and backpack for the scent, if any, of controlled substances.

23. Trooper Cooper has been employed with the State Police for 17 years and has been assigned to the K-9 unit for the last 13 years. Trooper Cooper and his police K-9, Drako, have attended and successfully completed a 240 hour course in narcotic detection including marijuana, cocaine, heroin and methamphetamine. Trooper Cooper and Drako received accreditation for narcotic odor detection through the New England State Police Conference and continue to obtain re-certification every year, most recently in 2017. This certification is current. Since the initial training class, this K-9 has maintained and updated training at a minimum of 2 days per month. Trooper Cooper advised that searches conducted by Drako have led to the seizure of marijuana, cocaine, methamphetamine and heroin and Trooper Cooper advised that Drako is a well-trained and reliable K-9.

24. Barosy's property was placed randomly among several items chosen with no specificity. Items included assorted luggage (removed from storage), cardboard boxes containing various office supplies, and garbage bag containing refuse. The items were lined along the main corridor wall adjacent to the LATF offices. When directed by Trooper Cooper, his K-9 partner Drako executed a narcotics sniff on the exterior of all listed items. Subsequently, Trooper Cooper advised that Drako alerted positive to the odor of narcotics on both Barosy's checked luggage and backpack.

25. Subsequent to the K-9 examination, members of the LATF sought and obtained a search warrant from the Trial Court of Massachusetts Boston Municipal Court Department, East Boston Division (Warrant Docket No. 18SW0007), authorizing the search of Barosy's checked luggage and backpack.

26. After the search warrant was issued, members of the LATF examined the contents of Barosy's checked luggage and backpack and located what was later determined to be $48,940 the Currency, comprised of the following:

| Denomination | Number of Bills | Percent of Total | Amount of Denomination |
|---|---|---|---|
| $100 | 188 | 38.41% | $18,800 |
| $50 | 49 | 5.01% | $2,450 |
| $20 | 1,362 | 55.66% | $27,240 |
| $10 | 35 | 0.72% | $350 |
| $5 | 17 | 0.17% | $85 |
| $1 | 15 | 0.03% | $15 |
| TOTAL: | 1,666 bills | | $48,940 |

27. In my training and experience, large amounts of smaller denomination currency, including $20 bills, is consistent with proceeds of street-level narcotics distribution. Here, more than 55% of the total value of Currency and 1,429 bills (more than 85% of the bills), were comprised of denominations of $20 bills or less. It is easier to transport large amounts of currency utilizing $100 bills than $20 bills and suggests transport that did not involve the use of a bank or other financial institution.

**Conclusion**

28.  Based upon the information set forth above, there is probable cause that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C § 881(a)(6) because it is moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

Signed under the penalty and pains of perjury this 26 of July, 2018.

_____
Eugene M. DiFiore
Special Agent
Drug Enforcement Administration