UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-CV-11582-RWZ

UNITED STATES OF AMERICA, Plaintiff

v.

$48,940 IN UNITED STATES CURRENCY, Defendant

EDWIN BAROSY, Claimant

MEMORANDUM & ORDER

March 22, 2022

ZOBEL, S.D.J.

On February 1, 2018, federal and state law enforcement personnel seized Claimant Edwin Barosy's ("Claimant" or "Barosy") luggage at Boston's Logan International Airport. They eventually searched the luggage following a positive alert by a drug-sniffing dog. The search revealed a large amount of cash, the subject of this forfeiture action. Barosy moves to suppress evidence of the cash and the results of the dog sniff on the ground that the search was unlawful under the Fourth Amendment. Docket # 19. Upon consideration of the parties' submissions and evidence presented at an evidentiary hearing, the motion is denied.

I.  **Findings of Fact**

Two witnesses testified at the evidentiary hearing held on February 24, 2022: Drug Enforcement Administration ("DEA") Special Agent Eugene DiFiore ("SA DiFiore")

1

and Massachusetts State Police ("MSP") Trooper David Walsh[1] ("Trooper Walsh"). In addition, the parties offered into evidence five documents: (1) the Receipt for Cash or Other Items acknowledging the confiscation of Barosy's two bags signed by SA DiFiore ("Def.[2] Ex. 1"); (2) the Application for Search Warrant submitted by Trooper Walsh ("Gov't Ex. 2"); (3) the Affidavit in Support of Application for a Search Warrant submitted by Trooper Walsh and attached to the Application for Search Warrant ("Gov't Ex. 2"); (4) the issued Search Warrant ("Gov't Ex. 3"); and (5) the Return of Officer Serving Search Warrant form signed by Trooper Walsh ("Gov't Ex. 4"). Based on the evidence, I find the following facts.

On January 31, 2018, the Logan Airport Task Force ("LATF")—a joint venture between the DEA and MSP established to interdict the flow of illegal drugs and bulk currency related to the sale of drugs—received information from Jet Blue Airlines that Barosy had booked a one-way ticket from Boston to Los Angeles less than 24 hours before the flight's scheduled departure. At that time, the LATF had many years of experience successfully seizing and forfeiting hundreds of thousands of dollars travelling through Logan Airport to California, an identified source-area for drugs. Members of the LATF, including SA DiFiore, who at the time had been assigned to the LATF for 8 of the 13 years he had worked for the DEA, were familiar with the common patterns and practices exhibited by drug and currency couriers, including that couriers often booked their travel last minute, cancelled or made changes last minute, and

---

[1] Walsh currently holds the rank of Sergeant.
[2] Although the exhibit is labeled as Defendant's Exhibit 1, Barosy is not identified as a Defendant to this or any other matter associated with the forfeiture at issue.

arrived late for their departing flights to limit their time in the airport and avoid detection by law enforcement.

The LATF also knew at the time Barosy booked his ticket that he had been associated with the email address of Steve Pierre, a drug trafficker known to the DEA. In April 2016, Pierre's email address had been used to purchase a plane ticket for Barosy. The DEA also knew of other instances over the years when Pierre and/or his email address was associated with the travel reservations of other individuals whom the LATF had interdicted as couriers of drugs or large amounts of cash eventually forfeited as proceeds of illegal drug sales. The LATF further knew that Barosy had previously been arrested for and charged with, although not convicted of, a number of drug-related offenses. Based on this information, the LATF set up surveillance at Logan Airport in advance of Barosy's departing flight. As boarding began, however, the LATF learned that Barosy had cancelled his reservation and rebooked for the first flight out the following morning.

That morning, February 1, 2018, at around 5:00 a.m., the LATF team, including SA DiFiore and Trooper Walsh, set up surveillance in anticipation of Barosy's arrival for his flight. At approximately 6:00 a.m., fifteen minutes before boarding was scheduled to begin for his flight, Barosy arrived at Logan Airport and checked one piece of luggage. He kept a backpack as his carry-on. Barosy then proceeded through security and on to his departure gate.

SA DiFiore retrieved Barosy's checked bag, met with Trooper Walsh and Sergeant Steven Lopes ("Sgt. Lopes"), and proceeded to Barosy's departure gate to interdict Barosy. SA DiFiore and Sgt. Lopes approached Barosy near the gate, but

Trooper Walsh maintained his distance with the other law enforcement personnel in the area. All of the officers were in plain clothes and carried concealed firearms.

When SA DiFiore and Sgt. Lopes approached Barosy, they identified themselves, showed him their credentials, and asked if he would agree to speak with them about his travel. Barosy agreed. The officers told Barosy that he was not detained and was free to leave at any time, and they did not crowd him so that he would feel free to walk away at any point. SA DiFiore testified that Barosy initially appeared relaxed, did not appear to be upset or scared, and did not behave in any way to suggest he felt he could not end the encounter. When asked by SA DiFiore why he was traveling to Los Angeles, Barosy responded that he was going to look at a piece of property, but was not able to provide any details, including where the property was located or how much it would cost. Barosy said that his business partner, "Steve," had that information. When SA DiFiore suggested to Barosy that Steve was Steve Pierre, Barosy denied any knowledge of who Steve Pierre was. At some point during this line of questioning, Barosy said he needed to call his attorney, then stepped away to make a phone call. He rejoined SA DiFiore and Sgt. Lopes after the call.

Based on the information LATF had on Barosy and his ticket reservation as well as the officers' observations of him during the course of conversation, SA DiFiore informed Barosy that they had reason to suspect his involvement in the trafficking of narcotics or the proceeds of the illegal sale of narcotics and that they were going to seize his luggage pending further investigation.[3] SA DiFiore provided Barosy with his options at that point: he could consent to a search of his two bags or, if he declined, he

---

[3] SA DiFiore testified that throughout the surveillance and investigation at issue, the LATF team suspected Barosy of couriering the proceeds of illegal drug sales, not drugs themselves.

4

could continue on his flight to Los Angeles without his bags or he could wait at the MSP barracks near the airport while they obtained a search warrant. After 5-10 minutes without receiving a response, SA DiFiore told Barosy that they were going to seize the bags and seek a search warrant. When SA DiFiore attempted to seize the backpack from Barosy's shoulder, Barosy flinched backward and attempted to prevent SA DiFiore from taking it. SA DiFiore warned Barosy that interfering with the seizure of his bags could lead to criminal charges. At that point, Barosy relented but asked if he could get his keys from the front pocket of the backpack. Instead of allowing Barosy to retrieve the keys, SA DiFiore instructed Sgt. Lopes to open the bag and search for the keys with Barosy's permission. When Sgt. Lopes opened the front pocket of the backpack at Barosy's direction, a large bundle of cash was exposed. Sgt. Lopes located the keys, gave them to Barosy, and closed the front pocket. The officers asked Barosy if there was more money in the bag. Barosy did not respond.

After being informed that his bags would be seized pending further investigation, Barosy asked for a receipt for his property. The officers did not have a receipt with them at the gate, but told Barosy that he could go to the MSP barracks near the airport and get one there. Barosy chose to ride with the officers to the barracks, which was a three-minute drive from the airport. Within approximately 15-20 minutes of arriving at the barracks, SA DiFiore prepared a typed receipt and gave it to Barosy, who was waiting in the public lobby. Barosy left with the receipt at approximately 7:00 a.m. By that time, he had missed his flight to Los Angeles.

At some point before Barosy left the MSP barracks with his property receipt, Trooper Walsh called for a K9 unit to report to perform a drug-sniff test on Barosy's two

bags. Trooper Walsh testified that he made the call at the time it became clear that the bags were going to be seized for further investigation, which he stated was at the end of the interview with Barosy at the departure gate, approximately around 6:30 a.m. According to Trooper Walsh's testimony, a K9 team is always called in when an interdiction is made at the airport. To get a K9 team, Trooper Walsh called the dispatch center to locate the nearest available K9 team, which is typically somewhere near the airport but technically can be anywhere in the Commonwealth. According to the Return of Officer Serving Search Warrant form signed by Trooper Walsh (i.e., Gov't Ex. 4), the search of the bags occurred at 1 p.m., which means the dog-sniff, which was included to support the search warrant, occurred before then. Neither party presented affirmative evidence of the time the dog-sniff actually occurred.

When the K9 team arrived, the dog, who was trained to alert to narcotics but not currency, performed a drug-sniff test of Barosy's two bags and alerted positive to narcotics for both. Trooper Walsh then completed the application for a search warrant for the bags. On the face of the document, the application identified the objects of the search—that is, the items to be searched for—as Barosy's two bags. Gov't Ex. 1. The affidavit to the application, which the application incorporated by reference, states, however, that the officers believed they had probable cause that the bags contained

> drugs, moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchanged for a controlled substance as proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Gov't Ex. 2 ¶ 8. They relied on the positive sniff-test results as well as the information about Barosy's travel arrangements, previous association with Steve Pierre, Barosy's

6

drug-related criminal charges, and Barosy's conduct during the interview by law enforcement at his departure gate. The Boston Municipal Court granted the search warrant, which the officers executed at approximately 1:00 p.m. that day. Although the search warrant also identified the object of the search as Barosy's two bags, it incorporated by reference the same affidavit attached to the application. The search uncovered $50,440.00 in U.S. currency, 85% of which was comprised of bills of $20 or less, two cell phones, a credit card reading device, and men's clothing. Gov't Ex. 4. The government seeks forfeiture only of $48,940 of the recovered money.

## II.  Discussion

Barosy seeks to suppress the evidence seized during the February 1, 2018 search of his bags at the MSP barracks. Docket # 19. He argues that the seizure and search of his bags violated his Fourth Amendment rights because (1) the officers lacked "reasonable suspicion that his bags contained narcotics," (2) "the manner of the investigation was unreasonable because it was neither brief nor conducted with diligence," and (3) "the warrant was invalid because it did not authorize a search of the contents of Barosy's bags and did not particularize the property to be seized beyond the bags themselves." Docket # 20.

### A.  Law Enforcement Had Reasonable Suspicion to Seize Barosy's Property

Barosy argues that the government has failed to "articulate any facts that would provide reasonable suspicion that Barosy was transporting narcotics in his luggage." Docket # 20 at 7. The seizure of his luggage, therefore, was impermissible under the Fourth Amendment. Id. at 6-9. The government, on the other hand, asserts that the officers had sufficient reasonable suspicion the luggage contained evidence of a crime,

7

that is, proceeds of illegal drug sales, which justified the seizure of the bags. Docket # 23 at 7-13.

Barosy's argument relies on an unsupported, narrow reading of the case law. The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures by the government. U.S. Const. amend. IV; see, e.g., Terry v. Ohio, 392 U.S. 1, 8-9 (1968). "Warrantless searches are *per se* unreasonable, unless they fall within a well-defined and specifically enumerated exception to the warrant requirement." United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014). When law enforcement personnel make "brief investigatory stops of persons or vehicles that fall short of traditional arrest ... the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted).

In United States v. Place, the U.S. Supreme Court extended the reasonable suspicion standard to the detention of luggage at an airport for the purpose of a "sniff test." United States v. West, 731 F.2d 90, 91-92 (1st Cir. 1984) (citing United States v. Place, 462 U.S. 696, 707 (1983)). In that case, although the holding was limited to a determination that there was reasonable suspicion that the subject property contained narcotics, the Court explains that a seizure based on "reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime" would be permissible under its jurisprudence. See Place, 462 U.S. at 702; see also id. at 706 ("Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment

8

interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime."). Barosy has not identified, nor could the Court find, any authority that limits the rationale articulated in Place only to seizures based on suspicion of narcotics and not currency believed to be the proceeds of illegal narcotic sales. The focus of the inquiry, therefore, is whether SA DiFiore had reasonable suspicion that Barosy's luggage contained evidence of a crime, specifically proceeds of illegal drug sales. Based on the facts presented, he did.

To assess the existence of reasonable suspicion, courts "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks omitted). "This reasonableness inquiry deals with degrees of likelihood, not ... certainties or near certainties ... and ultimately we must make a practical, commonsense judgment based on the intricacies of each case." Tiru-Plaza, 766 F.3d at 116 (internal quotation marks and citations omitted). In making this determination, courts give credit to officers' experience and specialized training that allows them "to draw from the attendant circumstances inferences that would 'elude an untrained person.'" Id. (citation omitted). Courts "also seek to balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." Id. (internal quotation marks and citation omitted). The government has the burden of showing the officers had reasonable suspicion. United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006).

At the time SA DiFiore seized Barosy's bags for further investigation, he knew that (1) Barosy's flight reservations and appearance at the airport fit the known pattern of narcotics and currency couriers—Barosy booked his flight to a known drug source city last minute, cancelled last minute, rebooked for early the next morning, and arrived at the airport just fifteen minutes before his departure time; (2) Barosy had been charged with drug-related offenses in the past; and (3) he was associated with the email address of Steve Pierre two years prior. Barosy's behavior during the encounter with SA DiFiore and Sgt. Lopes only validated that suspicion. Barosy could not provide basic details about his travel plans or the last name of his purported business partner. See, e.g., United States v. Marrocco, 578 F.3d 627, 633-34 (7th Cir. 2009) (concluding that "[t]he officers were permitted to consider [suspect's] responses and mannerisms, the circumstances surrounding his ticket purchase, their own experience and knowledge, and the 'characteristics of persons engaged in illegal activities,' when determining whether the [luggage] was likely to contain contraband" (citation omitted)). Based on these facts—viewed in their totality—SA DiFiore had particular, articulable reason to suspect that Barosy's bags contained evidence of drug trafficking that justified detaining the bags to further investigate with a sniff test.

### B. The Detention of Barosy's Luggage Was Permissible

Barosy next argues that even if law enforcement had reasonable suspicion to justify detaining his bags for further investigation, the manner of the investigation was unreasonable and thus a violation of his Fourth Amendment rights. Docket #20 at 9-12. Specifically, Barosy contends that the officers did not act with diligence for two reasons: first, the officers did not have a K9 unit available at the airport despite having advance warning of Barosy's travel; and second, they did not have a property receipt with them

at the departure gate, a failure which necessitated that Barosy travel to the MSP barracks, wait for one there, and miss his flight. Id.

It is not necessary to resolve this issue here, however, because, from the moment Sgt. Lopes opened Barosy's backpack to retrieve Barosy's keys and the bundle of cash was exposed, the officers had probable cause to detain Barosy's luggage. United States v. McFarlane, 491 F.3d 53, 56 (1st Cir. 2007) ("A[] [detention] does not contravene the Fourth Amendment's prohibition on unreasonable seizures so long as the [detention] is supported by probable cause."). Probable cause is "a flexible, common sense standard [that] merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false." United States v. Gordon, No. 14-CR-10304-DPW, 2016 WL 11668976, at *5 (D. Mass. Aug. 30, 216) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)), R. & R. adopted United States v. Gordon (D. Mass. Nov. 14, 2017).

Here, the fact that Barosy had concealed a very large amount of cash in his carry-on bag taken together with the other facts the officers had justifying their reasonable suspicion—the information about Barosy's travel arrangements, his previous association with Steve Pierre, his drug-related criminal charges, and his conduct during the interview by law enforcement at his departure gate—created probable cause that Barosy had evidence of a drug-related crime in his luggage. This allowed the officers to detain his bags for purposes of the sniff test and later search regardless of how long it took for the sniff test to occur or that the officers did not have a property receipt on hand

11

at the departure gate. See id. (finding officers had probable cause to seize money revealed during a routine TSA search where defendant was traveling to a known drug source area, gave officers suspicious reasons for his travel, had multiple drug-related arrests, and was a suspected drug dealer).

### C. The Search Warrant Was Valid

Finally, Barosy argues that the executed search warrant was invalid on its face because by identifying the object of the search as his two bags the warrant failed to describe the property to be searched and seized with particularity. Docket # 20 at 12-14.

The Court agrees that the face of the warrant incorrectly identified the object of the search as the bags and not the property within the bags. That was clearly a mistake because the officers already had possession of the bags and thus did not need to search for them. Nonetheless, this mistake does not doom the warrant. Trooper Walsh's affidavit attached to the application for the search warrant sufficiently and specifically clarified the object of the search, i.e., contraband related to illegal drug sales, including cash, contained within the luggage. Gov't Ex. 2 ¶ 8 (noting the officers had probable cause to suspect that Barosy's bags contained "drugs, moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchanged for a controlled substance as proceeds traceable to such an exchange"). The warrant application and the warrant itself included unequivocal language incorporating by reference Trooper Walsh's affidavit. Gov't Ex. 1 ("The undersigned APPLICANT … ha[s] the following information based upon the attached affidavit[] … which is [] incorporated herein by reference…."); Gov't Ex. 3 ("Proof by affidavit, which is hereby incorporated by reference, has been made this day

12

and I find that there is PROBABLE CAUSE to believe that the property described below … is unlawfully possessed or concealed for an unlawful purpose…."). The affidavit, and its explicit incorporation by reference in the search warrant, therefore cures any deficiency that may exist on the face of the warrant. See United States v. Burgos-Montes, 786 F.3d 92, 108 (1st Cir. 2015) ("Affidavit language expressly incorporated by the warrant can satisfy the particularly requirement."); Rivera-Rodriguez v. Beninato, 469 F.3d 1, 5 (1st Cir. 2006) ("an affidavit may cure deficiencies which would exist were the warrant to stand alone").

### III. Conclusion

Claimant's Motion to Suppress Evidence (Docket # 19) is DENIED.

March 22, 2022
DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE